Ernest W. JOHNSON, Jr., Defendant,
Appellant,

v.

UNITED STATES of America,
Appellee.

No. 6130.

United States Court of Appeals
First Circuit.

Heard Oct. 10, 1963.

Decided Dec. 3, 1963.

Edward O. Proctor, Jr., Boston, Mass., with whom Chester M. Howe and Ely, Bartlett, Brown & Proctor, Boston, Mass., were on brief, for appellant.

A. David Mazzone, Asst. U. S. Atty., Boston, Mass, with whom W. Arthur

Garrity, Jr., U. S. Atty., Boston, Mass., was on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

The defendant was convicted on eight counts of an indictment charging him with wilfully aiding in the preparation and filing of false and fraudulent corporate excise tax returns in violation of section 7206(2) of the Internal Revenue Code of 1954. On this appeal he attacks the admissibility of certain evidence, the sufficiency of the evidence to convict, and the correctness of a portion of the charge. We are not helped by the fact that in both brief and oral argument he recites and treats the evidence in the light most favorable to himself when, at this stage of the proceedings, the reverse is required. Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; Smith v. United States, 1 Cir., 1954, 210 F.2d 496, aff'd, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192. The consequences are particularly conspicuous in that much of the testimony relied on by defendant came from his brother, who could be found to have exhibited more solicitude for the defendant than complete candor, and from defendant himself. Such testimony need not be considered against the jury verdict. Conway v. United States, 1 Cir., 1960, 278 F.2d 710.

During the years in question (1956–1958) the defendant, in addition to certain other duties, was a bookkeeper for Gordon's Inc., which operated a retail jewelry store in Framingham, Massachusetts. His brother was the company's president. An accountant prepared the other tax returns, but defendant kept corporate books and prepared quarterly returns for the retail dealer's excise tax. The company's gross income was not derived exclusively from the re-

tail sales of articles subject to this tax (hereinafter "taxable articles") and on his own admission defendant determined the amounts reportable for the periods in question simply by applying a self-determined formula to total gross receipts. Individual sales were not entered in the corporate books, at least in such fashion that it could be ascertained whether they were of taxable or nontaxable items, and at the time of the tax audit only the most recent sales slips (for a period immediately following that of the indictment) had been retained. Examination of these revealed a gross understatement for that period. The government's evidence to show an understatement for the indictment quarters consisted largely of certain so-called green sheets, and the results of an investigation conducted by one O'Brien, a revenue agent. The propriety of these two sources of evidence presents the only questions.[1]

At the government audit the examiner, in response to a request to a corporate officer for the company's records which would support the excise returns, was given, along with other papers that clearly were corporation records and others that clearly were not, a cardboard folder containing sixteen green sheets. These contained columned dollar and cent figures compiled and entered daily by the defendant under the following heads: Net Suburban, Tax, Total Gross, Gross Suburban, and Intown. All figures except those under the headings Tax and Net Suburban, accurately reflected other (summary) entries in the corporate books. The Net Suburban entries were the computed differences between Gross Suburban and Tax. The latter figures had no counterpart. Hence, while the Tax column was not confirmed by other records, by the same token it was not contradicted.

■ Under the circumstances the jury was warranted in finding these figures to be what on their face they pur-

<hr>

1. The issues of defendant's participation, and of his wilfulness, were submitted to the jury on adequate instructions, and on the view we take of the other questions defendant has no valid complaint on that score.

ported to represent. Defendant's proferred explanation that the sheets were "just like my own personal record of daily business" is a meaningless characterization.[2] His further explanation that the tax entries were purely ficticious, purposely exaggerated to be used solely against suburban gross sales for determining the rent due under the company's percentage lease, at most created a question of fact. It is understandable that as between the two the defendant would now prefer to take the position of having defrauded the landlord than the government, but this is not necessarily a free choice. Furthermore, the contention, and more particularly defendant's own testimony, concedes that there was a business purpose to the records, viz., to compute the monthly net suburban sales and rent figures for submission to the landlord. We cannot say that the jury could not accept so much of the testimony as claimed that the green sheets were maintained in part for this purpose, but reject the further assertion that the tax figures were fictional. The government's burden under 28 U.S.C.A. section 1732 in this case did not go to the extent of proving the records accurate, but only that they were prima facie regular and kept for the management and operation of the business.[3]

▇▇ The green sheets were properly admitted. Thereafter, the issues of their ultimate authenticity, United States v. Tellier, 2 Cir., 1958, 255 F.2d 441, 448, cert. den. 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62, 7 Wigmore, Evidence § 2135

(3d ed. 1940), and probative effect were for the jury. We hold they warranted a finding of substantial understatement.

▇▇ Further to show that the tax had been understated the government offered evidence of the company's purchases of taxable articles from its various suppliers. This was done through revenue agent O'Brien in a manner which would have been precisely within the strictures of Greenberg v. United States, 1 Cir., 1960, 280 F.2d 472, but for the fact that defendant made the following stipulation.

" * * * if a duly authorized representative of any of the suppliers of Gordon's, Inc. were called to the witness stand and was requested to produce a transcript of his company's account with Gordon's, Inc. for the years 1956 to 1961 inclusive, *designating those purchases subject, upon resale, to the federal retail jewelry excise tax*; and if, after objection, he was permitted to produce such records, he would produce the records which have been given Special Agent Daniel O'Brien in response to his such request, subject to the defendant's motion to strike." (Ital. suppl.)

Unfortunately, much of the trial was devoted to disputes as to what was the stipulation's effect. Pursuant to it O'Brien was permitted to introduce evidence resulting in total yearly figures of allegedly confirmed purchases of taxable articles by the company. Taking the year 1957 as an example, this amounted

---

2. Defendant, who was a salaried employee with no proprietary interest in the business, did not even suggest a reason, other than "I like figures," why he should have a personal, as distinguished from a corporate purpose. At the same time he must maintain that this "liking" did not deter him from seeking an "easy way" out of a "lot of bookwork" when it came to recording excise tax figures.

3. Defendant does make one argument perhaps calling for special comment. The amounts in the Tax column in the latter part of the indictment period frequently bore, within a few cents, a consistent percentage relationship (7%) to the suburban gross sales. Defendant argues, since the company did both taxable and nontaxable business, that this consistency shows the entries were meaningless. He is in a peculiarly poor position to make this argument because his principal defense against wilfulness was that in previous years he had discovered that a percentage formula produced, from quarter to quarter, results which, far from being meaningless, corresponded within a dollar to a detailed tabulation. This argument, too, raises only a question of fact.

to $22,228. On gross figures (undisputed) taken from the green sheets O'Brien computed that the amount of taxable sales attributable to the suburban sales [4] for that year was $18,099,[5] which would have meant a tax of $1,810. The tax actually declared was $669. Defendant attacks O'Brien's testimony on several grounds. (1) That all the suppliers' responses to O'Brien were improper conclusions of law—in other words, that they did not know which of their goods were subject to excise taxes and which were not. Not only might a jury find it unlikely that a regular supplier would be ignorant on this score, but the whole stipulation was meaningless if defendant intended to reserve such an objection. (Note italicized words, supra.) (2) That some suppliers did not divide the figures they furnished into taxable and nontaxable articles, but submitted only one figure, which O'Brien treated as wholly taxable. We agree with the district court that it was open to the jury to conclude that such suppliers answered the government's query [6] by reporting only taxable items. (3) That some of the local suppliers were visited by O'Brien directly, who then made his own summary instead of taking the suppliers' written report. We need not consider whether there might be merit to this objection had it not been advanced for the first time on appeal. If the point had been adequately made below the government could have easily called the local suppliers to the stand and filled the gap. Defendant is too late. Cf. Reiss v. United States, 1 Cir., 1963, 324 F.2d 680. (4) That O'Brien's figures covered something less than one half of the company's sup-

pliers, and were accordingly "artificial." [7] This is a patent misconception of O'Brien's formula, which clearly assumed that all suppliers not heard from sold only nontaxable items. Although defendant raises a still further point, interwoven in his argument is the contention that the errors listed thus far made O'Brien's basic figures "inherently incredible." Defendant fails to meet the government response that O'Brien's calculation results in a total of purchased taxable articles which does not, in the sense that the implication of understatement is affected, differ substantially from a figure obtained by a logical adoption of certain testimony of defendant's own witnesses.

(5) The only somewhat troublesome question is O'Brien's assumption, for the purpose of his formula, that the company's Intown sales were in the same proportion of taxable and nontaxable articles as were its suburban sales. The defendant's brother, although producing no corroborative records, testified that 95% of the intown sales for resale were of taxable articles. If this were true, and if the Intown sales were in the amounts stated and were substantially all for resale, O'Brien's formula would admittedly be substantially incorrect.

We query first the actual amount of nontaxable Intown sales in the light of the lack of any corroborative records, particularly in view of defendant's evidence that intown sales were made at little or no profit, just to raise cash, and of defendant's self-asserted propensity to understate net suburban sales so as not to pay the rent due under the lease,

4. There was no tax due on Intown sales, so-called, if defendant's evidence is accepted, as the government did for the purpose of this formula, that those were solely to other retailers.

5. The formula assumed that taxable suburban sales during the year were in the same ratio to total suburban sales as confirmed purchases of taxable articles bore to total purchases for the same year, and hence assumed implicitly that Intown sales included nontaxable articles to the

same extent as did suburban. Defendant claims this assumption is in error. See point 5, infra.

6. The government requested a "transcript of account * * * designating those purchases subject, upon resale, to the federal retail jewelry excise tax."

7. To support the claimed consequences of this, defendant's brother testified that all suppliers who did not report sold only nontaxable articles.

which might equally well have been accomplished by increasing the Intown sales figure. But passing this, if defendant is correct as to the amount of non-taxable Intown sales of taxable articles, and in his claim that O'Brien had too large a figure for taxable purchases, it would follow that the company sold few taxable articles in its retail store.[8] Since the company's principal business was that of retail jewelry, we believe that if anything is "inherently incredible" here it is not the position of the government.

O'Brien's formula may have imperfections, but, on this record, we think defendant was adequately treated. If, in fact, the jury erred, defendant has himself to thank for not keeping basic records. Int.Rev.Code of 1954, § 6001; Treas.Reg. 51, § 320.72 (1941), as renumbered by T.D. 5353, 1944 Cum.Bull. 605, as amended, T.D. 5677, 1948–2 Cum. Bull. 193. Indeed, if his conduct in that respect was wilful he might have been subject to prosecution on a further charge. Int.Rev.Code of 1954, §§ 7203, 7343.

Finally, defendant objects to the court's charge in which it permitted the jury to conclude from O'Brien's calculations alone that the tax had been understated. We do not agree with the government that the defendant did not save his rights, nor that O'Brien's testimony was fairly limited to corroborating the understatement indicated by the green sheets. But we hold, having in mind it was not incumbent upon the government to prove the exact amount of the understatement, that O'Brien's evidence was in itself sufficient. Indeed, this river was crossed once it is determined that the evidence was admissible.

No other matters need be considered.

Judgment will be entered affirming the judgment of the District Court.

8. If we were to assume no understatement of tax the same point would follow from other testimony accepted by the defendant. Taking, for example, the first quarter of 1956, total sales subject to tax as indicated by the corporation's filed quarterly return were $973.50. Total gross sales, from the (undisputed) green sheet figures, less merchandise returns there shown and less the tax actually reported, were $10,872.80; subtracting from this the Intown figure, gives $6,317.76 as the total suburban sales, excluding tax. It is very difficult to believe that only $975.-30 of these were of taxable articles.