324 F.2d 680
 Ernest REISS, Defendant, Appellant,
v.
UNITED STATES of America, Appellee.
JOADA REALTY CORPORATION, Defendant, Appellant,
v.
UNITED STATES of America, Appellee.
William M. JACOBS, Defendant, Appellant,
v.
UNITED STATES of America, Appellee.
Fred B. DOLE, Defendant, Appellant,
v.
UNITED STATES of America, Appellee.
 Nos. 6095-6098.
 United States Court of Appeals First Circuit.
 Heard Sept. 23, 1963.
Decided Nov. 1, 1963, Rehearings Denied in Nos. 6095-6097,
Dec. 3, 1963.
 
 Walter Powers, Jr., Boston, Mass., with whom Walter Powers and Stephen A. Hopkins, Boston, Mass., were on brief, for appellants in Nos. 6095 and 6096.
 Abraham S. Goldstein, New Haven, Conn., with whom Francis J. Monahan, Boston, Mass., and Barbara A. Black, New Haven, Conn., were on brief, for appellant in No. 6097.
 George W. Gold, Boston, Mass., for appellant in No. 6098.
 Paul A. M. Hunt, Asst. U.S. Atty., with whom W. Arthur Garrity, Jr., Boston, Mass., was on brief, for appellee.
 Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit judges.
 ALDRICH, Circuit Judge.
 
 
 1
 Appellants, Jacobs, Reiss and Dole, were indicted in two counts for conspiracy to defraud the United States, 18 U.S.C.A. 371, in connection with two Massachusetts highway condemnations affecting the federal fisc, of. Harney v. United States, 1 Cir., 1962, 306 F.2d 523, cert. den. O'Connell v. United States, 371 U.S. 911, 83 S.Ct. 254, 9 L.Ed.2d 171. Each taking was of a (separate) portion of a lot belonging to Joada Realty Corporation, a fourth appellant.[1] Appellants were acquitted on Count One, but, along with one DeSimone who does not appeal, convicted on Count Two. It will be more convenient to leave to the last a recitation of the evidence.
 
 
 2
 Reiss complains at the outset of the court's failure to grant a continuance requested because of the hospitalization of his intended real estate expert witness, one Donovan, ten days before trial. It is elemental that on such an issue the burden is the heavy one of showing an abuse of discretion. Isaacs v. United States, 1895, 159 U.S. 487, 16 S.Ct. 51, 40 L.Ed. 229. The court felt, both before the trial and afterwards, that Reiss had sufficient opportunity to obtain another witness. The record contains nothing affirmatively counter to this conclusion. We attach no weight to counsel's prophecy, when he discovered Donovan was ill, that he would not be able to obtain a replacement. Equally unprobative is the statement in the brief that 'it may be assumed, in view of the importance of the testimony, that Reiss and his counsel did all they could to find a sufficiently qualified witness, and that if they found none it must have been because of the limitations of time.' A burden is not met by such 'assumptions,' particularly when there was another inference in fact drawn by the trial court. At the hearing on defendants' motions for new trial the court expressed the opinion that, in the light of the testimony and a view of the locus which the court and jury had taken, the reason no other expert was produced was because no honest expert could testify the way Reiss desired.
 
 
 3
 This statement of the court points out a further defect in Reiss' position. Whether in addition to having to show an abuse of discretion or as a part of such a showing, an appellant must normally demonstrate a likelihood of prejudice. Neufield v. United States, 1941, 73 App.D.C. 174, 118 F.2d 375, 380, cert. den. Ruben v. United States, 315 U.S. 798, 62 S.Ct. 580, 86 L.Ed. 1199; Lockhart v. United States, 6 Cir., 1920, 264 F. 14, cert. den. 254 U.S. 645, 41 S.Ct. 14, 65 L.Ed. 455; cf. Heflin v. United States, 5 Cir., 1955, 223 F.2d 371, 375, rev'd on other grounds, on collateral attack, 358 U.S. 415, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959). In the ordinary instance this may be done by an affidavit of the absent witness' expected testimony. This case is unusual in that Reiss' complaint was that he did not have a witness, and, by hypothesis, was in no position to aver. We need not determine just what a disappointed appellant must show in such a situation by way of prejudice. It is enough to hold that he should not, as here, leave a record indicating the reverse.
 
 
 4
 When Reiss requested the continuance the government stipulated that if he failed to obtain another witness he might have Donovan testify by affidavit. In due course Reiss produced an affidavit from Donovan, but, unaccountably, the opinion expressed therein gave but a single dollar figure for the two takings combined. It is difficult to disagree with the district court that any expert should have known better because not only was each taking involved in a separate count of the indictment, but each was independent in time, characteristics and effect. Although advised by the court of the inadmissibility of such testimony Reiss failed to obtain a further statement. From the fact that Donovan had sufficiently advanced in his studies to give a combined figure for both takings it is reasonable to infer that this failure to make the separation was not due to lack of preparation, but was because of the unsatisfactory disclosure such a separation would have produced. His subsequent silence, particularly having in mind that an expert who had been working on a matter for months might well be expected to have at least some basis for an opinion by the time the case was about to be reached, strengthened the unfavorable inference. We recognize that expert testimony may produce special problems, but on this record we find no error in the court's concluding that even with a continuance Reiss never would have any witness, Donovan included, who could help him on the second count.
 
 
 5
 Reiss' next contention, that the verdicts on Counts One and Two were fatally inconsistent, was more than adequately answered by the further remarks of the district court in denying the motion for new trial. We will not repeat them.
 
 
 6
 All defendants object to the court's using the term 'dishonest methods' in defining fraud to the jury, claiming that, through ambiguity or otherwise, the charge was too broad. Each defendant was represented by competent counsel who had both ears and eyes to measure the charge's meaning and effect.[2] Not one voiced any objection. We may well assume that if there was an ambiguous overstatement it was a meaning so hidden that the jury, too, would not discover it. United States v. Kahaner, 2 Cir., 1963, 317 F.2d 459, 478-479, cert. den. 84 S.Ct. 74. Alternatively, if defendant are correct, it was a ruling that could have been curtailed to fit the exact circumstances of the case without doing violence to any principle. This is peculiarly a situation where a party owes a duty to the court to make known his position.[3]
 
 
 7
 We will mention briefly defendants' claim that the assistant United States attorney was guilty of prejudicial misconduct in asking two questions of a witness Poster which improperly suggested an illegal payoff. This claim, too, is too late. The court sustained a general objection to the government's questions, without stating its grounds. The defendants did not ask for a mistrial, or that the jury be instructed forthwith to disregard any inference the questions may have suggested. They argue that they did ask, at the conclusion of Poster's testimony, that all his testimony be stricken. This motion was denied, and we note parenthetically, properly. But, contrary to defendants' present contentions, this motion was directed to answered questions and had nothing to do with those which were unanswered. While we are not unsympathetic with defendants' feeling that asking the second question after the first had been excluded reveals the true motivation behind the questioning, the court took, with respect to these questions, all the action requested of it. It may well have concluded the defendants felt it better to let the matter pass, hopefully unnoticed, than to make further comment. In the absence of clear prejudice, which we do not find here, it is too late for defendants now to suggest an alternative. Jenkins v. United States, 5 Cir., 1958, 251 F.2d 51; see Webb v. United States, 10 Cir., 1951, 191 F.2d 512, 516; cf. Green v. United States, D.C.D.Mass., 1958, 158 F.Supp. 804, 809, aff'd 1 Cir., 256 F.2d 483, cert. den. 358 U.S. 854, 79 S.Ct. 83, 3 L.Ed.2d 87. But cf. Pierce v. United States, 6 Cir., 1936, 86 F.2d 949, 952-954. Rather, this is a typical case of 'Monday-morning-quarter-backing,' Schino v. United States, 9 Cir., 1953, 209 F.2d 67, 73, cert. den. 347 U.S. 937, 74 S.Ct. 627, 98 L.Ed. 1087, that the courts have only too frequently been called upon to reject.[4]
 
 
 8
 We turn to the contentions, differing in detail from defendant to defendant, that the evidence did not warrant findings of guilt. The evidence showed that the corporate defendant Joada was the owner of a 13.80 acre lot in Lowell, Massachusetts acquired from the city in 1956 for $18,000 (allegedly at a bargain rate) and containing an alleged special-purpose factory, then erected, at a cost of some $550,000. The first taking, which was the one involved in the first count of the indictment, reduced one side of the lot by some two acres and materially, it could be found, impeded access to the factory. A staff appraiser of the Massachusetts Department of Public Works initially estimated the damages at $25,000. Under the Commonwealth's procedure it was necessary, because this figure exceeded $2,500, that there be 'outside' appraisals (normally two) which, along with the Departmental appraisal and other information, would be submitted through defendant Dole's office to the statutory Board of Review, hereinafter Board. The Board was then authorized to set the maximum figure for administrative settlement. As associate commissioner in charge of rights of way it was Dole's assigned duty to appoint outside appraisers, and he appointed, as one, defendant Jacobs. Jacobs thereafter submitted a figure of $132,665. This taking was eventually disposed of at the price set by the Board of $120,000. When a year later the second taking, involved in the second count of the indictment, was made, the Department appraiser, one John Riley, made an estimate of $26,350. Dole again appointed Jacobs, who reached a figure of $86,436. He also appointed defendant DeSimone, who submitted $89,600. The Board was dissatisfied with these appraisals and requested another. Dole thereupon appointed one William Riney whose appraisal proved to be $10,000; and thereafter, at the further request of the Board, one Andrew, whose figure was $7,800. The Board thereupon set $20,000 as a maximum, which Reiss refused to accept. Subsequently this undictment was brought.
 
 
 9
 The government's principal contention is that the defendants conspired to cause the submission of inflated appraisals, Dole participating at least to the extent of actively countenancing and permitting the conspiracy's operation. With respect to the conscious unfairness of Jacobs' appraisal there was credible evidence that the consequences of the second taking of less than an acre were relatively slight.[5] The jury was properly instructed, with adequate limitations, that if an appraisal was so 'grossly excessive as to indicate bad faith' it could find dishonesty. We have reviewed all of the testimony and exhibits and are satisfied that Jacobs' appraisal could satisfy such a test.[6] The jury could further infer from his unethical attempted contacts with the other appraisers that Jacobs was aware of his own errors. His presently proffered explanation is that, because he 'undoubtedly knew' the Board was questioning his appraisal, his conduct only indicates worry lest Riney's report improperly reflect on his professional reputation. But this suggestion, debatable at best, is obviously no answer to his approaches to Riley, whose appraisal was made long before his. We have no problem with respect to the jury finding as to Jacobs' dishonesty.
 
 
 10
 The next question is whether Jacobs' dishonesty was simply his own, so that there was no conspiracy, or whether others, such as Reiss, were parties to it. We need deal here only with Reiss. We note briefly Reiss' denial to the grand jury that he knew Jacobs before the latter came to Lowell in connection with the first Joada taking, when in fact he had met Jacobs three or four times several months earlier in connection with a taking of land in Lexington in which he also had an interest; his answer as to why when he, his plant manager, and Jacobs were discussing the purchasing of trucks for the plant through Jacobs, he did not tell his manager that Jacobs was currently appraising the company's property for the Commonwealth because 'I didn't think of it';[7] and certain other failures of memory. Obviously Jacobs would not be dishonest for Reiss' benefit without some expectation of personal profit. The jury could infer that this expectation was based on a prior understanding and not simply on some hope that Reiss might reward him out of spontaneous gratitude.[8] We cannot say that the finding against Reiss was unwarranted.
 
 
 11
 We are unable, however, to see any case against Dole. With respect to him the government does no more than list a number of presumptively innocent actions. Unless such actions are in some way related so that they reflect upon each other, an accumulation of nothings is still nothing. Conspiracy cannot be established by mere 'inferences no more valid than others equally supported by reason and experience.' United States v. Bufalino, 2 Cir., 1960, 285 F.2d 408, 419. Passing such obvious speciousness as its reliance upon the fact that Dole's appointment had expired and that he was a 'holdover,' and that he was a 'necessary' cog because if he had not appointed Jacobs and DeSimone as appraisers, Jacobs, DeSimone and Reiss could not have conspired, the government points to the fact that Dole caused Jacobs' appraiser's fee to be raised, and that Dole visited the property personally in connection with the first taking. However, the evidence shows that it was neither unusual nor improper to raise fees, and there is no suggestion that this particular increase was unreasonable. Similarly, there was no evidence indicating that it was abnormal for Dole, in connection with negotiating a case, to visit the property himself.
 
 
 12
 Even less defensible is the claim made extensively by the government that Dole's personally negotiating the first taking with Reiss was 'strange' because its witness Brown testified that he never knew of a case that Dole had personally negotiated 'in the eastern half' of Massachusetts. Nowhere does the government advert to the fact that on cross-examination Brown testified that Dole personally negotiated 'many' claims in western Massachusetts, and that Brown's authority did not extend to the eastern half of the state and he was in no position to know what Dole did or did not do there. The sum total of Brown's testimony was meaningless, except to suggest that the government had asked him a deliberately loaded question amounting to a misrepresentation, had it not later been corrected, that might have fatally infected a conviction. Even if this were not the case, we are constrained to say that it is not only shortsighted, but improper, for the government to argue its witness' direct testimony in disregard of obvious modifications and explanations made on cross.
 
 
 13
 Nothing of this, singly or collectively, reflects unfavorably upon Dole. Nor does the fact that Jacobs appeared to have inside knowledge of Department activities. There was no indication that Dole was his source.
 
 
 14
 The district court, in denying Dole's post-trial motions, adverted to other matters.
 
 
 15
 'When he appointed Jacobs as a fee appraiser, Dole knew that Jacobs was friendly with Reiss and also knew that in an earlier Joada taking Jacobs had made an appraisal in excess of what the Board of Review of the DPW regarded as a reasonable maximum. From these facts, the jury could have inferred that at least by the time of the second taking, Dole knew that Jacobs would act in a biased way and that Dole knowingly facilitated a conspiracy between Reiss and Jacobs to defraud the United States in connection with * * * (that taking).
 
 
 16
 'Moreover, Dole had visited the Joada property at the time of the first taking. From Dole's personal knowledge of the property, the jury reasonably could have inferred that Dole immediately knew that an appraisal of over $80,000 for the second taking was dishonest. Dole's office received and Dole's secretary transmitted the appraisals of Jacobs and DeSimone to the Review Board. The jury reasonably could have inferred that with intent to aid a conspiracy among Reiss, Jacobs, and DeSimone, Dole read the appraisals of his own appointees or with criminal intent deliberately refrained from reading them, and knowing these appraisals to be dishonest, caused them to be transmitted to the Review Board.'
 
 
 17
 We find this, too, unconvincing. The only knowledge Dole was shown to have of Jacobs being 'friendly' with Reiss was that Jacobs had presumably met Reiss in connection with his previous appraisal, and had considered the damages to be ten percent higher than the figure finally approved by the Board. If these two facts are sufficient for a finding that Dole could anticipate that Jacobs on the next occasion would act in a 'biased,' viz., dishonest, way, one may wonder what public official could safely delegate authority to anyone. We do not take such a view of human behavior, nor will we compel others to do so under pain of criminal responsibility. On the government's own evidence Dole had no duty to pass upon appraisals. To conclude under these circumstances that if he failed to look at the second Jacobs appraisal he affirmatively 'refrained' 'with criminal intent' is neither legally nor factually supportable.[9]
 
 
 18
 Alternatively if, in the absence of any evidence that Dole saw the appraisal, it could be inferred that in fact he did do so, which in itself we must question, to say that he was then bound to examine it critically, not because he had a normal duty so to do, but simply because, having seen the property the year before in connection with the taking of another, uncontiguous, portion, he should immediately have been struck with the second appraisal's dishonesty, we find equally untenable. If such a conclusion could ever be drawn it would not be here where the appraisal contained no misrepresentation of any physical characteristics of the premises, but only errors of a less conspicuous nature. We note further, as the government concedes, that Dole had dealt with several hundred other properties since he had seen this one. The court correctly charged the jury that carelessness is not dishonesty. In the light of Dole's duties, or, rather, lack of them with respect to appraisals, we could not on this record consider him even careless.
 
 
 19
 Judgment will be entered remanding the action to the District Court with an order to acquit the defendant Dole; as to all other appellants the judgments will be affirmed.
 
 ON PETITIONS FOR REHEARING
 
 20
 PER CURIAM.
 
 
 21
 The only new matter sought to be raised on the appellants' (other than Dole) petitions for rehearing is the claim that since these defendants were charged with conspiring with Dole and he is not guilty, they, equally, could not be guilty, or, alternatively, they have been prejudiced. It is elementary that all defendants named as conspirators need not be convicted. Even if a case goes to verdict, the verdict as to one may be set aside without affecting the others. Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 247, 60 S.Ct. 811, 84 L.Ed. 1129. In the present case there was ample evidence of a conspiracy between Jacobs and Reiss. We do not agree that 'this evidence cannot be segregated.' Rather, as is intrinsic in our opinion, it is because it was separable that we ordered Dole's acquittal. While in such a situation Jacobs and Reiss might be entitled to a new trial, this would be only if we thought it reasonably possible that the jury's finding against them had in fact depended upon its belief in elements of the government's 'case' against Dole. We have no such thought.
 
 
 22
 The petitions for rehearing are denied.
 
 
 
 [1]
 Joada Realty Corporation, of which defendant Reiss was the principal officer and a substantial stockholder, admittedly stands or falls with Reiss and will not be separately considered
 
 
 [2]
 Fillowing a practice we have previously approved, the court gave copies of the charge to counsel before delivering it, and thereafter gave the jury the transcript
 
 
 [3]
 Nor do we find the court's error, if any, gross and palpable. On the contrary, defendants' point, based on a refined analysis and criticism of Hammerschmidt v. United States, 1924, 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968, even if sound, is not necessarily applicable to the charge as we construe it
 
 
 [4]
 On the subject of Monday morning we note that on the second Monday of the present term (October 14, 1963) the Supreme Court was called to act upon at least six cases in which defendants had unsuccessfully sought to raise questions for the first time on appeal. United States v. Kahaner, 2 Cir., 1963, 317 F.2d 459; United States v. Guidarelli, 2 Cir., 1963, 318 F.2d 523; Grant v. United States, 5 Cir., 1963, 315 F.2d 395; Butler v. United States, 8 Cir., 1963, 317 F.2d 249; Rossetti v. United States, 9 Cir., 1963, 315 F.2d 86; White v. United States, 9 Cir., 1963, 315 F.2d 113. (Certiorari was denied in each case.)
 
 
 [5]
 It is unnecessary to detail the evidence, except to say that the jury could find that there was no present use of the taken parcel for parking; that any such future use was problematical; that land in the vicinity could still be purchased for $2,000 an acre, and that the only other alleged serious effects, the impeding of access to the factory, were essentially caused by the first taking only
 
 
 [6]
 The defendants attack this issue in one manner than calls for comment. Prior to trial the government had a further appraisal made by one Horn. His final figure of $21,620 was criticized by the defendants, who sought to isolate one of the steps by which it was reached and claim an inconsistency or incongruity. We concede this was a valid jury argument, but we are not prepared to say that as matter of law defendants could insist on segmenting the appraisal, either to reject it entirely, or to make use of a fragment for independent purposes. An appraisal is over-all methodology
 
 
 [7]
 This episode may be noted in passing. Reiss (more exactly, Reiss Associates, Inc.) bought three rebuilt trucks through Jacobs at this time obstensibly upon competitive bids, but concededly Jacobs' bid was not the lowest. It is understandable that Reiss might not tell his plant manager of Jacobs' other connection, but that Reiss did not have it in mind is far less so
 
 
 [8]
 Reiss' ethics may be deduced from a letter to his (then) counsel inquiring whether it would better the condemnation case to park cars on the second parcel in order to 'establish conclusively' (contrary to the fact) that it was needed as a parking area. Nor was counsel's reply calculated to effect his moral regeneration
 
 
 [9]
 The court's similar conclusion with respect to the DeSimone appraisal is even less understandable for, at least on the record before us and in the court's reference to matters before it, there is no indication that DeSimone had had any contact whatever with Reiss before Dole appointed him to appraise the second taking