VINCENT B. MARTORELLI AND G. DIANE MARTORELLI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Martorelli v. Commissioner
Docket No. 9000-76.
United States Tax Court
T.C. Memo 1980-291; 1980 Tax Ct. Memo LEXIS 294; 40 T.C.M. (CCH) 848; T.C.M. (RIA) 80291; August 4, 1980, Filed Robert J. White, for the petitioners. Joseph C. Hollywood, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined deficiencies in petitioners' income tax, plus additions to the tax under section 6653(b) [1] for fraud, as follows: Year
Deficiency 1a
Sec. 6653(b)
1969
$ 29,012.63
$ 14,506.32
1970
7,576.96
3,788.48
The issues for decision are: (1) Whether petitioner's customer's "redbook" is admissible as evidence pursuant to the business record exception to the hearsay rule, Rule 803(6), Federal Rules of Evidence.
*296 (2) Whether petitioners received unreported gambling income in 1969 or 1970. (3) Whether any part of the resulting deficiencies for 1969 or 1970 was "due to fraud" within the meaning of section 6653(b). FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. At the time they filed their petition, petitioners resided in Flint, Michigan. Petitioner G. Dians Martorelli is a party solely by virtue of having filed a joint return with her husband. When we hereafter refer to petitioner, we will be referring to Vincent Martorelli. During the years in issue, petitioner conducted a bookmaking operation from his residence. [2] Petitioner's customers either approached him personally or telephoned his residence to place bets on horses which were running at various tracks throughout the United States. [3] These customers received the same odds as those prevailing at the racetrack, but subject to a maximum payoff. For example, the maximum payoff on a $2.00 bet might be $32.00, regardless of how high the odds were at the racetrack. After accepting his customers' bets, petitioner would decide whether he wanted to "underwrite" the bet himself *297 or whether he wished to "lay off" the bet, i.e., transfer the risk of the bet to someone else. For instance, if petitioner felt a given bet was too large, he would either place it with another bookmaker or place it at the racetrack.Most of the time petitioner assumed the full risk of the bets which he accepted. [4] Petitioner generally refused to accept bets from customers who were delinquent in settling their accounts. One of petitioner's customers was Albert Silver. In 1969 and 1970 Silver promoted "Ponzi" type schemes known as the Twenty Grand Clubs. Each Club consisted of twenty members who paid $1,000 each for their membership. In exchange for this membership fee, Silver placed bets on horses he selected on the Club's behalf. Silver assured each member of a minimum monthly return on their $1,000 investment as part of the promotional *298 activities to attract members. Each member received a monthly newsletter indicating the horses played during that month and the amounts won by the Club. The newsletter was accompanied by a check representing the member's allocable share of the Club's net winnings. A member could withdraw from the Club at any time and get back his original $1,000 investment. Silver funneled the membership fees from the Twenty Grand Clubs into Turf Enterprises, Inc., another of Silver's operations. Turf Enterprises served two functions. First, it sold "tout" or tip sheets to the general public through mail subscriptions. Silver selected the horses which appeared on these tip sheets. Second, Turf Enterprises served as the conduit through which Silver placed bets on behalf of the Twent Grand Clubs and on his own behalf. Originally Turf Enterprises sent its employees to the racetrack to place its bets. In 1969 and 1970 Turf Enterprises placed its bets over the telephone through three bookmakers, one of whom was petitioner. The operations at Turf Enterprises followed a daily routine. Each morning Silver called the bookkeeper into his office to advise her of that day's bets. Silver instructed *299 the bookkeeper which horses to bet, how much to bet on each horse, what type of bet to place (win, place or show), and which bookmaker to use. The bookkeeper then telephoned the designated bookmaker and promptly recorded the day's bets in the company's ledgers. The bookkeeper routinely and carefully maintained separate ledger sheets for each of the bookmakers. These ledger sheets reflected detailed information including the name of the horse played, the name of the racetrack, the number of the race, the amount of the wager, the payoff, if any, on that wager, and the profit or loss incurred on that wager. The bookkeeper filed these ledger sheets in a red loose-leaf folder (the "redbook"). At the top of each ledger sheet appeared a code identifying the bookmaker to which it referred. The code "#1", "V" or "Vince" identified those ledger sheets pertaining to petitioner. Turf Enterprises placed bets with petitioner on a daily basis following the above routine. Petitioner never refused to accept a bet from Turf Enterprises. The volume of bets placed with petitioner exceeded those placed with the other two bookmakers combined. Before placing the current day's bets, the bookkeeper *300 verified with petitioner the accumulated balance due from, or owed to, petitioner. The bookkeeper performed this verification by referring to the appropriate ledger sheets in the redbook. Any discrepancies between the bookkeeper and petitioner were always resolved. Petitioner visited Turf Enterprises' offices on a regular basis, usually once a week, to settle his account. In anticipation of settling his account with petitioner, Silver would ask the bookkeeper to calculate the amount owed by Turf Enterprises or the amount due to it. The bookkeeper calculated these amounts from the redbook and Silver relied solely on these calculations for making or receiving payments on behalf of Truf Enterprises. After the bookkeeper totaled the amounts she marked them as either paid or received. The parties used only cash to settle their accounts; they did not exchange any receipts or other documentation evidencing the cash transfers. If Silver did not have sufficient cash on hand to settle the account, he would send an employee to the bank to cash a check drawn on Turf Enterprises or on one of the other companies he controlled. The transfers between Silver and petitioner occurred in the *301 privacy of Silver's office with no one else being present. [5]
Petitioner also accepted personal bets from the employees of Turf Enterprises. These bets were placed by the bookkeeper when she placed the bets for Turf Enterprises. If an employee won, petitioner either paid that employee during one of his visits to Turf Enterprises' offices, or Silver paid the employee and subtracted the amount paid from the balance owed to petitioner. If an employee lost, the employee generally gave an envelope containing money to Silver who would give it to petitioner during one of his office visits. During 1969 and 1970 Turf Enterprises wagered and lost a considerable amount of money. On bets placed with petitioner, Turf Enterprises lost $59,585 in 1969 and $23,674 in 1970 according to the redbook. In 1969 and 1970 Silver fabricated the information contained in the monthly newsletters sent to the members of the Twenty Grand Clubs. As a result of this fabrication, the Clubs continued to claim net winnings despite the large losses actually incurred by Turf Enterprises. The members of the Clubs continued to receive checks for their *302 allocable shares of these fabricated winnings until the entire scheme finally collapsed in 1970. [6] The Securities and Exchange Commission instituted an investigation of Silver's activities following the collapse of the Twenty Grand Clubs. Petitioners timely filed their 1969 and 1970 joint federal tax returns. In 1969 they reported the total gross income of $14,553.34 of which $11,500 was labeled as "money won at tracks"; in 1970 their entire gross income of $11,911.60 was reported as "monies won at race tracks." Petitioner prepared his 1969 and 1970 joint tax returns and he fully understood that gambling income constituted reportable, taxable income. Petitioner pleaded guilty in Michigan to charges of entering into a gambling contract by taking wagers from Turf Enterprises. In his statutory notice, respondent determined that petitioners had unreported income derived from gambling activities of $59,585 in 1969 and $23,674 *303 in 1970. In addition, respondent determined that petitioners are subject to additions to the tax for fraud under section 6653(b). OPINION Admissibility of the "redbook"
The first issue is whether the ledger sheets (the "redbook"), which describe the bets placed with petitioner by Turf Enterprises, Inc., are admissible into evidence to prove the truth of the transactions reflected therein. Respondent argues that the redbook, clearly hearsay, was made in the regular course to Turf Enterprises' business and is admissible under the business record exception to hearsay. On the other hand, petitioner contends that the circumstances surrounding the compilation of the redbook indicate a lack of trustworthiness and, therefore, the redbook should not be admitted into evidence. For the reasons stated below, we agree with respondent. The parties agree that the admissibility of the redbook is controlled by Rule 803(6), Federal Rules of Evidence.Rule 803(6) provides: HEARSAY EXCEPTION; AVAILABILITY OF DECLARANT IMMATERIAL The following are not excluded by the hearsay rule, even though the declarant is available as a witness: * * * *304 (6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit. Moreover, the parties agree that the basic requirements invoking the rule's application have been satisfied. [7] The parties' disagree on whether "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Rule 803(6), Federal Rules of Evidence.
*305 The underlying rationale for the business record exception to the hearsay rule is the unusual reliability and accuracy of business records: The element of unusual reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation. Advisory Committee Notes to Rule 803(6), 56 F.R.D. 308 (1973). See also McCormick, Law of Evidence (2d ed. 1972), sec. 306. The facts of the present case indicate that all of the above indicia of reliability were associated with the compilation of the redbook. First, the data contained in the redbook was verified with petitioner on a daily basis. This systematic checking made it highly unlikely that any errors in the redbook would go unnoticed or uncorrected. Second, the same bookkeeper made the entries in the redbook on a daily basis. Third, Turf Enterprises relied on the redbook to settle its account with petitioner. Fourth, the bookkeeper, as an employee of Turf Enterprises, was under a duty to use care in making *306 the entries in the redbook. Despite the apparently high degree of reliability associated with the redbook, petitioner contends that the redbook is not trustworthy for two reasons. First, petitioner argues that the fraudulent nature of the activities involving the Twenty Grand Clubs taint any records produced by Turf Enterprises. According to petitioner, the fact that the people who were responsible for the compilation and distribution of the false newsletters to the members of the Twenty Ground Clubs, i.e., Silver and his employees, were the same people who compiled the redbook, readily demonstrates the unreliability of the redbook. The weakness in petitioner's logic is the absence of any connection between the information distributed to the members of the Twenty Grand Clubs and the information contained in the redbook. The redbook and the newsletter served two distinct functions. The redbook was an integral part of the day-to-day operations of Turf Enterprises whereas the newsletter was basically a marketing device to solicit larger investments from existing members and to entice new members to subscribe to the Clubs. Furthermore, the false profits reported in the monthly *307 newsletters were not derived from the redbook, which reflected a long series of losses. In our view, the fact that Silver distributed false information, derived from an unrelated source, [8] does not make the redbook a less than reliable source of information so as to be inadmissible under Rule 803(6), Federal Rules of Evidence.
Second, petitioner claims "the only purpose for the creation of the 'red book' was to justify the losses to investors." In other words, petitioner alleges that Silver created the redbook to substantiate how he spent the money received from members of the Twenty Grand Clubs. The implication of petitioner's allegation is that the redbook was compiled in anticipation of some legal action by, or on behalf of, the membership of the Clubs. [9] Accordingly, petitioner contends that the presence of this alleged motive to misrepresent or falsify the redbook's contents warrants exclusion of the records as untrustworthy. *308 Petitioner's position is untenable. The redbook was not some "dummy" record compiled for the purpose of covering up illegal activities. Rather, the redbook constituted an integral part of an ongoing, albeit illegal, business. [10] The record indicates that the day-to-day transactions between Turf Enterprises and petitioner were recorded in the redbook, that these entries were verified on a daily basis with petitioner in order to disclose any errors, and that these entries were relied upon by Turf Enterprises in the settlement of its account with petitioner. In light of these facts, we refuse to believe that the redbook was merely some fabricated documentation. [11]
*309 In support of is position, petitioner cites Palmer v. Hoffman,318 U.S. 109 (1943), affg. 129 F. 2d 976 (2d Cir. 1942). In Palmer, the record in issue was an accident report prepared for use in litigation. In rejecting the admissibility of the accident report as a business record, the Court stated: [The report] is not a record made for the systematic conduct of the business as a business. An accident report may affect that business in the sense that it affords information on which the management may act. It is not, however, typical of entries made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls. * * * Unlike payrolls, accounts receivable, accounts payable, bills of lading, and the like, these reports are calculated for use essentially in the court, not in the business. Their primary utility is in litigating, not in railroading. 318 U.S. 109, 113-114(1943). Unlike the evidence in Palmer, the record in issue here is integrally related to the day-to-day business affairs of Turf Enterprises. The need for accounting records *310 and the reliance placed on them in the conduct of a business' day-to-day affairs serves as a strong, positive countermotive to the misrepresentation of those records. See United States v. Baxter,492 F. 2d 150, 165 (9th Cir. 1973); 5 Wigmore, Evidence sec. 1527 (Chadbourn rev. 1974). [12]
We hold that the redbook is admissible under Rule 803(6), Federal Rules of Evidence.
Unreported Income
The second issue is whether petitioner received unreported income in 1969 or 1970. Petitioner claims that he accurately reported all his profits from gambling activities on the joint *311 tax returns filed for those years. At trial petitioner produced no tax records relating to his gambling activities in 1969 or 1970. Respondent contends that petitioner had unreported gambling income of $59,585 in 1969 and $23,674 in 1970. In support of his position, respondent relies solely on the entries made in the redbook maintained by Turf Enterprises. Every taxpayer, subject to certain exceptions not herein applicable, is required to maintain permanent books and records sufficient to establish the amount of gross income required to be shown on his tax return. Sec. 301-6001-1(a), Proced. & Admin. Regs. When a taxpayer keeps no books or records, or has failed to retain such books or records, respondent is authorized to compute the taxpayer's income by using any reasonable method which clearly reflects the taxpayer's income.See sec. 446(a) and (b); Harbin v. Commissioner,40 T.C. 373, 377 (1963). Respondent's determination is prima facie correct and petitioner has the burden of showing it is erroneous. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Preliminarily, we address petitioner's *312 failure to produce any records at trial of his gambling activities. Although not clearly articulated, petitioner apparently claims that he turned over his records to one or more unnamed agents representing some unspecified governmental agency. Petitioner introduced no receipts indicating that he turned over any records to a government official. Rather, petitioner's testimony regarding the whereabouts of his records was evasive, vague and incredible. While we have found that petitioner maintained daily records in order to settle his accounts with customers, [13] these records were either not retained by petitioner or, if retained, they probably contained information unfavorable to petitioner's position. See Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), affd. 162 F. 2d 513 (10th Cir. 1947). Petitioner's main contention is that the record does not establish that he ever received any unreported income. According to petitioner, the entries in the redbook merely suggest the possibility that monetary transactions *313 occurred between Silver and petitioner, but that no evidence exists to verify that the events recorded in the redbook actually occurred. We disagree. Although there exist no eyewitnesses to the actual monetary exchanges between Silver and petitioner, [14] we find the evidence supporting the occurrence of the redbook transactions to be clear and convincing. A recital of the facts in this case supports our conclusion. Petitioner readily admits that (1) he accepted bets from Turf Enterprises; [15] (2) he regularly visited the offices of Turf Enterprises to settle his account; and (3) he was paid cash by Turf Enterprises without the exchange of any receipts or other documentation. Petitioner also admits that generally he did not accept bets from customers who did not pay their accounts. The credible testimony of employees of Turf Enterprises establishes that (1) petitioner never refused to accept a bet from Turf Enterprises; (2) Turf Enterprises placed bets with petitioner *314 on a daily basis; (3) the result of every bet was entered into the redbook; (4) these entries were verified with petitioner on a daily basis; (5) Turf Enterprises relied solely on the entries in the redbook to settle its account with petitioner; (6) the periodic payments between Turf Enterprises and petitioner were reflected in the redbook; and (7) Silver, on behalf of Turf Enterprises, withdrew money from various banks in order to have sufficient cash on hand to settle petitioner's account. We find that the cumulative effect of all the above evidence indicates that the redbook accurately reflects the transactions between Turf Enterprises and petitioner. Petitioner introduced no evidence indicating to what extent, if any, his reported income for 1969 and 1970 included the transactions reflected in the redbook; nor has petitioner introduced any evidence of unreported losses which would offset some or all of his unreported income; nor has petitioner introduced any evidence that he "laid off" any of the redbook transactions to other bookmakers or at the racetrack. Consequently, we find that petitioner *315 had unreported income of $59,585 in 1969 and $23,674 in 1970. Fraud Penalty
The final issue is whether any part of the deficiencies resulting from petitioner's failure to report gambling income was due to fraud. The existence of fraud is a question of fact to be determined upon consideration of the entire record. Stratton v. Commissioner,54 T.C. 255, 284 (1970). For fraud to be present, we must find that petitioner acted with the specific intent to evade a tax believed to be owing. Mitchell v. Commissioner,118 F. 2d 308, 310 (5th Cir. 1941). Respondent has the burden of proving by clear and convincing evidence that petitioner is liable for additions to tax for fraud. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. Respondent must establish fraud for each individual year in issue. Stone v. Commissioner,56 T.C. 213, 220 (1971). This burden may be met with circumstantial evidence, Powell v. Granquist,252 F. 2d 56, 61 (9th Cir. 1958), but fraud is never presumed or imputed. Switzer v. Commissioner,20 T.C. 759, 765 (1953). For the reasons stated below, we conclude *316 that respondent has carried his burden here. [16]
First, our prior findings indicate that petitioner failed to report a substantial amount of income derived from his gambling activities in 1969 and 1970. [17] Furthermore, we find that this understatement *317 has been demonstrated by clear and convincing evidence sufficient to establish, with the other evidence entioned below, the fraudulent nature of the returns. The consistent understatement of large amounts of income is persuasive evidence of a fraudulent intent to evade tax. Rogers v. Commissioner,111 F. 2d 987 (6th Cir. 1940); Harper v. Commissioner,54 T.C. 1121, 1139 (1970). Second, petitioner's failure to furnish either the Court or representatives of respondent with his records, which he admittedly maintained during 1969 and 1970, is an indicium of fraud. Cefalu v. Commissioner,276 F. 2d 122, 129 (5th Cir. 1960).[18] This is especially true in a business dealing in cash where transactions are easily concealed due to the absence of any documentation such as canceled checks. [19]
*318 Third, at the time he prepared his 1969 and 1970 tax returns, petitioner knew that income derived from gambling activities constituted taxable income. Under these circumstances, it is difficult to believe that petitioner did not possess the requisite intent when he omitted these substantial amounts from his 1969 and 1970 tax returns. Fourth, the manner in which petitioner reported his 1969 and 1970 gambling income was less than frank. On his tax returns petitioner reported his source of gambling income as "money won at tracks;" nowhere is there any reference to petitioner's bookmaking activities. The concealment of sources of income is indicative of fraud. Spies v. United States,317 U.S. 492 (1943). Petitioner's treatment of self-employment taxes further evidences his desire to conceal his bookmaking operations. Petitioner characterized himself as self-employed, yet during the years in issue he failed to file any self-employment tax returns, sec. 6017, and he failed to pay any self-employment taxes, sec. 1401. At trial, petitioner testified that he did not intentionally fail to file self-employment tax returns. In general, we found petitioner's testimony *319 to be evasive, contradictory and incredible. [20] Consequently, we believe petitioner's omissions with respect to self-employment taxes were not mere oversights, but rather constituted part of his plan to conceal his bookmaking operations. Even if petitioner's income were not understated, he was still obligated to pay self-employment taxes on the reported income derived from his bookmaking operations. Although his failure to pay these taxes, without more, might not be sufficient to support the fraud penalty, these omissions when aggregated with the other "badges" of fraud clearly demonstrate the validity of the fraud assessment. Petitioner's only rebuttal to the assessment of the fraud penalty is his reiteration that the record does not establish he ever received any unreported income and, therefore, respondent has not met his burden.We have *320 previously addressed this argument, see discussion, supra, wherein we concluded that the evidence cearly and convincingly shows petitioner received unreported income.
In sum, we conclude that respondent has shown by clear and convincing evidence that all por part of petitioner's underpayment of tax was due to fraud. To reflect the foregoing, Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
1a. Included in the deficiencies are amounts related to self-employment taxes.↩
2. At one time petitioner possessed a federal tax stamp relating to his gambling activities but the stamp had not been renewed during the years in issue. ↩
3. Petitioner recorded his daily gambling transactions on unlined and unbound sheets of paper. ↩
4. During the years in issue, petitioner did not "lay off" bets to other bookmakers.↩
5. Silver maintained an office at Turf Enterprises.↩
6. Presumably the amounts received by the members were funded by the sale of new Club memberships or by the distribution of the Clubs' capital. None of the members existing when the Clubs collapsed received any of their original investment back.↩
7. For example, there is no dispute that (1) the entries in the redbook were made contemporaneously with the transactions recorded; (2) the person transmitting or recording the information had personal knowledge of the transactions; (3) the entries made in the redbook were made as part of the regular routine of a business activity; and (4) the redbook has been satisfactorily authenticated.↩
8. The record does not disclose how the newsletter was compiled.↩
9. There is no evidence in the record that, at the time the redbook was prepared, Silver or Turf Enterprises was being investigated or that either party knew of any impending investigation.↩
10. The illegality of a business, without more, does not affect the admissibility of its records. See United States v. Re, 336 F. 2d 306, 313 (2d Cir. 1964), cert. denied 379 U.S. 904↩ (1964). 11. On brief, petitioner states that "upon investigation by the S.E.C. * * *, Mr. Silver claimed that he had lost all of the investment and produced various books showing bets made, winnings and losses." The record contains no evidence that the redbook was put to such use; but even if the redbook were used as petitioner claims, this would have no bearing on our decision. The mere use of one's records in a self-serving manner is no bar to their admissibility as business records under Rule 803(6), Federal Rules of Evidence. See Advisory Committee Notes, 56 F.R.D. 310 (1973); Laughlin, Business Records and the Like, 46 Iowa L. Rev. 276, 285↩ (1961).
12. See also United States v. Re, 336 F. 2d 306, 312-313 (2d Cir. 1964), cert. denied 379 U.S. 904 (1964); Johnson v. United States,325 F. 2d 709, 711↩ (1st Cir. 1963); McCormick, Law of Evidence (2d ed. 1970), sec. 308, at 724 n. 49 ("Thus where the only function that the report serve is to assist in litigation or its preparation, many of the normal checks upon accuracy of business records are not operative. Reliance upon the report's accuracy in the day-to-day operation of the business is significant.")
13. For instance, the daily verification between petitioner and Turf Enterprises indicates that certain records did exist.↩
14. The monetary exchanges between petitioner and Silver took place in the privacy of the latter's office. Prior to trial, Silver passed away thereby leaving petitioner as the only witness to these transactions.↩
15. Petitioner pleaded guilty to charges of accepting wagers from Turf Enterprises.↩
16. On brief respondent argued that in petitioner's reply to respondent's answer, petitioner had admitted that his 1969 and 1970 tax returns were false and fraudulent. Statements in the pleadings may constitute admissions. See McCormick, Law of Evidence (2d ed. 1972), sec. 265; 2 Jones, The Law of Evidence (Gard ed. 1972), sec. 13:40. In this case, however, petitioner's reply contained inconsistent statements. In subparagraph 7(n) of the reply, petitioner states that he admits the allegations contained in subparagraph 7(n) of respondent's answer. That subparagraph states that "petitioners' United States income tax returns for the taxable years 1969 and 1970 are false and fraudulent." However, at the end of petitioner's reply it states that petitioner denies any fraud or any understatement of income. Because of the internal inconsistencies in petitioner's reply we attribute no weight to the reply as an admission of fraud.↩
17. Petitioner understated his income by approximately 400% in 1969 and 100% in 1970.↩
18. See also Abernathy v. Commissioner,37 TCM 1529↩, 47 P-H Memo. T.C. par. 78,370 (1978). 19. See also Gerardo v. Commissioner,34 TCM 1480, 44 P-H Memo. T.C. par. 75,341 (1975), affd. in part and revd. in part 552 F. 2d 549↩ (3d Cir. 1977).
20. For example, petitioner claimed he turned over his records for 1969 and 1970 to an agent named "Clarence" for the purpose of computing his federal stamp taxes (excise taxes). On cross-examination, petitioner admitted he did not renew his federal tax stamp in 1969 or 1970 and, therefore, he did not give "Clarence" his records.↩