**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Thomas CAMPISI, Defendant-Appellant.**
**No. 382, Docket 24500.**

United States Court of Appeals
Second Circuit.

Argued June 5, 1957.
Decided Sept. 9, 1957.

Writ of Certiorari Denied Dec. 9, 1957.
See 78 S.Ct. 266.

Leonard P. Moore, U. S. Atty., for Eastern District of New York, Brooklyn, N. Y. (Joseph F. Soviero, Jr. and Margaret E. Millus, Asst. U. S. Attys., Brooklyn, N. Y., of counsel), for plaintiff-appellee.

Delaney & Donoghue, New York City (Peter J. Donoghue, New York City, of counsel), for defendant-appellant.

Before MEDINA, LUMBARD and WATERMAN, Circuit Judges.

MEDINA, Circuit Judge.

The indictment in this case charged, in the first count, a conspiracy to traffic in narcotics between the two Campisi brothers, Charles and Thomas, Ugo Giampaoli, Aniello Santagata and others. The third count alleges a sale of heroin by the Campisis, Giampaoli and Santagata in Springfield Gardens, Long Island, New York, on April 20, 1955. Charles Campisi is a fugitive from justice and was not tried; Giampaoli and Santagata pleaded guilty to the conspiracy and other counts of the indictment and were duly sentenced. The jury found Thomas Campisi guilty of conspiracy and of the substantive offense as charged; he received a three-year sentence on Count One, and a five-year sentence on Count Three, to run consecutively; and he appeals.

Reversal of the judgment is sought because of the alleged insufficiency of the evidence to support a conviction on either count, and because of various allegedly erroneous rulings by the trial judge, which are said to be so prejudicial as to have deprived appellant of a fair trial. It is also claimed that appellant has been subjected to double jeopardy because a sale of heroin by him in Newark, New Jersey, on July 19, 1955, was one of the overt acts enumerated in the conspiracy count, and evidence thereof was received, despite the fact that appellant had already been convicted of that specific substantive offense in the United States District Court for the District of New Jersey, and given a suspended sentence, sub nom. Gaspero Campisi.

The principal witness for the prosecution was Anthony Zirilli, a Government Narcotics Agent, who, in cooperation with a Special Agent, Dick Montana, often referred to in the testimony as Al, made his initial contact with Giampaoli on March 13, 1955. Giampaoli was the chef at the Bella Roma Restaurant in Hempstead, Long Island, and he lived in a two-story building, with a tenant upstairs, at 143–43 Springfield Boulevard, Springfield Gardens, in Queens. When Zirilli ascertained that Giampaoli had some connection with the traffic in narcotics, he and the other Narcotics Agents working with him embarked upon the undertaking of proceeding on a long range basis in the hope of uncovering the entire group with which Giampaoli was associated, and particularly "the source" from which Giampaoli obtained his supplies of narcotics. As we shall see, "the source" turned out to be the appellant, and his brother Charles Campisi, in Newark, New Jersey.

Posing as a large operator with many customers, Zirilli told Giampaoli at his home in Springfield Gardens on April 16, 1955 that he would soon be ready to make a substantial purchase of heroin and wanted to know how much Giampaoli could procure and what his source of supply would charge for the merchandise. Giampaoli said he would find out; and the following day Zirilli was informed that Giampaoli "could get any amount of heroin," that the quality would be approximately 80% pure and the cost $9500 for a full kilogram and from $2800 to $3000 for a quarter kilogram. It was arranged that Giampaoli would procure a sample and this was delivered to Zirilli in two cellophane cigarette wrappers on April 18. Some dickering over the quality ensued, Zirilli heard some conversation on the subject by Giampaoli over the telephone, and he finally said he would take a quarter kilogram for $2300, after Giampaoli said "his man" would not take any less than $2000 and he had to make $300 profit for himself.

We now approach the evidence of the sale made on April 20, 1955, as alleged in Count Three. In order to justify the submission of the substantive offense to the jury it was necessary for the prosecution to prove that appellant associated himself with the venture in order to establish that he aided and abetted the commission of the offense charged. United States v. Peoni, 2 Cir., 100 F.2d 401.

The actual delivery of this large quantity of heroin was made to Zirilli by Giampaoli a little after 11 o'clock at night on April 20, 1955 at Giampaoli's home. After testifying to the preliminaries as above described, all Zirilli could add of his own personal knowledge was that, after the payment of the money Giampaoli could not at once say where and when the heroin would be delivered, that pursuant to arrangement Giampaoli and Zirilli met at the race track, where Zirilli was told to come to Giampaoli's house for the heroin that evening. In other words, Giampaoli did not have the heroin in his possession and had to go somewhere to get it.

In the meantime, a number of other Narcotics Agents saw Santagata drive up to Giampaoli's home, while Zirilli was still at the race track; Giampaoli got in and Santagata drove his Lincoln,

with New Jersey license plate PG11N, out to Kearney, New Jersey, where the Campisi brothers in a Chrysler car met them. Appellant got in the Lincoln and talked a while with Santagata and Giampaoli and then he got back in the Chrysler; there was much going up and down streets and around corners; then appellant got back in the Lincoln, which proceeded to a building at 458 South 11th Street, Newark, which appellant, Giampaoli and Santagata entered. Shortly thereafter they came out, and Santagata drove Giampaoli back to Giampaoli's home in Springfield Gardens, where Giampaoli, who did not have the heroin when he left Zirilli at the race track, pulled it out of his pocket and turned it over. From the testimony the jury was entitled to find that, from the time Santagata and Giampaoli left Springfield Gardens that afternoon until their return, they had made no other stops than above set forth nor had they met anyone other than the two Campisis.

The proof to sustain the conviction on the conspiracy count, much of which had considerable probative force in connection with the substantive charge, covered a wide range. And we shall proceed briefly to relate the facts in chronological sequence.

When the first quarter kilogram was delivered by Giampaoli on April 20, 1955, Zirilli did not know of the existence of Santagata, but he had already complained of the quality of the heroin in the sample and he threw out a few hints respecting the possibility of larger transactions, perhaps in Mexico on a joint basis. These Giampaoli evidently passed along to Santagata, as Zirilli intended.

On May 16, 1955, Zirilli told Giampaoli he would soon be ready to purchase some more heroin. On May 18 they met at Giampaoli's home and there was the usual telephoning. At first Giampaoli was going to deliver the narcotics at the Bella Roma Restaurant later that evening, but when Zirilli met him at the Bella Roma Restaurant he said he couldn't do it until the next day. On

May 19 they met again at the Bella Roma Restaurant and Giampaoli said "There was no need for him to go to Newark since his man was going to have the heroin with him." Accordingly, at Giampaoli's instructions, Montana drove Zirilli and Giampaoli to Flatbush Extension opposite the Mona Lisa Bridal Shop in Brooklyn. They went in and there was Santagata to whom Giampaoli introduced Zirilli for the first time. There Santagata asked Giampaoli if Zirilli was the one who had been talking about a trip to Mexico, but the subject was put off and they went out in the parking lot where, in the view of agent O'Connor, a Government witness at the trial, Santagata reached into the glove compartment of his car and delivered to Zirilli a brown paper package which contained the second quarter kilogram of heroin.

It would have been possible to arrest Giampaoli and Santagata at once, but Zirilli and his superiors were after bigger game. The Campisis were implicated too, although their precise role was not yet completely established. But, on May 25, 1955, shortly after the purchase of the second quarter kilogram, in a conversation at Giampaoli's home Santagata told Zirilli that he and Giampaoli were getting the heroin from the Campisis in Newark.

■■ The admission of this conversation, over objection, is one of the grounds urged for reversal. The question put to Zirilli called for a conversation with Santagata "about a man named Compy." The answer is:

"During this conversation with Santagata I told him that I had read in the newspaper about a man named Compy who had been murdered in Newark. He said that he knew the man. He knew the whole family, that in fact the name of the man was Campisi and that they were the people we were doing business with in Newark. * * * Santagata continued to say that he could not get pure heroin from these people because they were four

brothers and they had many mouths to feed and he said we can't blame them for adulterating the heroin because there are so many mouths to feed and so much money to be paid out."

The identification of the Campisi brothers as the suppliers of the heroin which Giampaoli and Santagata had delivered on April 20 and May 19 was of course damaging to appellant, but it was nonetheless admissible as the declaration of a co-conspirator in furtherance of the conspiracy. Lutwak v. United States, 334 U.S. 604, 618–619, 73 S.Ct. 481, 97 L.Ed. 593; Schine Chain Theatres v. United States, 334 U.S. 110, 116–117, 68 S.Ct. 947, 92 L.Ed. 1245; Glasser v. United States, 315 U.S. 60, 74–75, 62 S.Ct. 457, 86 L.Ed. 680; Logan v. United States, 144 U.S. 263, 308–309, 12 S.Ct. 617, 36 L.Ed. 429. It was also admissible in support of the substantive charge on the same theory, as an admission by an agent in the course of the performance of his agency. Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278; Lutwak v. United States, supra, 334 U.S. at pages 617, 618, 73 S.Ct. 481; Krulewitch v. United States, 336 U.S. 440, 442–443, 69 S.Ct. 716, 93 L.Ed. 790; Wolcher v. United States, 9 Cir., 233 F.2d 748, 750; 4 Wigmore, Evidence § 1079. For all the sales were made pursuant to the single, comprehensive arrangement. Zirilli had made complaints about the quality of the heroin and Santagata was anxious to retain such a good customer as Zirilli for the benefit of himself and his co-conspirators; and this explanation might well lead Zirilli to believe that they were all doing the best they could under trying circumstances. We find no error here.

In May, June and July the government agents sought to make direct contact with appellant, but this was not possible until Santagata was induced to go to Mexico with Zirilli for the ostensible purpose of starting a new venture of importing large quantities of narcotics from some people who were supposed to have a vast supply on hand ready for export. Zirilli and Santagata left for Mexico on July 14, 1955. In anticipation of the trip Zirilli introduced Narcotics Agent Joseph Tremoglie as his brother-in-law, to take care of his narcotics business and his customers while he was away in Mexico with Santagata, and Zirilli insisted that Tremoglie be taken to meet the Campisis in Newark as in no other way would Zirilli be given assurance that all would go well in his absence. Accordingly, the events of June 28, 29 and 30 relate to the purchase of another quarter kilogram of heroin for which Tremoglie paid $2500. Tremoglie went with Santagata to Newark on June 29, and he came back with the heroin; but he did not meet appellant as Santagata left Tremoglie in the car and in a short time delivered the narcotics. Zirilli was annoyed at this contretemps, Santagata had outsmarted him; but on July 19, 1955, Montana drove Tremoglie and Giampaoli out to Newark, and, as Tremoglie on this occasion positively refused to pay the money without being taken to the "source of supply," they parked the car, went up to appellant's home at 558 North 6th Street, Newark, where appellant was sitting on the stoop. They all went upstairs, Tremoglie paid the money and appellant took a package of heroin "out from under the seat cushion of the upholstered chair" and delivered it to Tremoglie. Prior to the delivery of the heroin Tremoglie had a conversation with appellant over the quality of the last purchase, with obvious reference to the transaction on June 29 when Tremoglie went to Newark with Santagata but was tricked into paying the money and accepting the heroin without meeting appellant. The conversation was: Tremoglie: "Is this stuff as good as the stuff I bought last time (June 29) when I came up with the old man with the gray hair (Santagata)?" Appellant replied, "Yes, the same thing. I had a piece and I broke it in four and this is one of the other four pieces." Appellant also volunteered some practical hints to be fol-

lowed in the distribution of the merchandise at retail.

█ It is idle to suggest that appellant was no more than a seller and Giampaoli and Santagata isolated purchasers acting for their own account and in no privity with appellant. The evidence discloses a narcotics ring operating on a large scale and with a highly organized system of avoiding detection. It is and has long been common practice to try conspiracy and substantive counts together in these narcotics cases and others, and we find the evidence sufficient to support the submission of both to the jury.

█ Nor does it matter that appellant was in Newark, and that there is no evidence that he was ever in the Eastern District of New York. Many of the overt acts scheduled in the conspiracy count of the indictment took place in the Eastern District, many of the sales were negotiated and the deliveries actually made in the Eastern District. This is sufficient. Ford v. United States, 273 U.S. 593, 619–620, 47 S.Ct. 531, 71 L.Ed. 793; Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114; Brown v. Elliott, 225 U.S. 392, 32 S.Ct. 812, 56 L.Ed. 1136; Krogmann v. United States, 6 Cir., 225 F.2d 220, 227; United States v. Cohen, 3 Cir., 197 F.2d 26; Ladner v. United States, 5 Cir., 168 F.2d 771; Davis v. United States, 5 Cir., 148 F.2d 203.

█ While the trial judge instructed the jury that no verdict of guilty on the conspiracy count could be arrived at unless the jury found "that at least one of the overt acts took place," appellant now urges as a ground for reversal that the instructions did not specifically require a finding that an overt act took place in the Eastern District of New York. But the proof of a number of overt acts in the Eastern District, some in Queens and at least one in Brooklyn, was uncontroverted and of the most substantial character. The omission was at most an inadvertence. Had appellant requested such an instruction, or excepted on that ground to the charge as given, we have no doubt the trial judge would have supplied the omission and the verdict would have been the same. But no exception was taken, no such request was submitted and appellant's counsel indicated no criticism whatever of any part of the charge. To reverse on such a point as this would be a travesty of justice. United States v. Trenton Potteries, 273 U.S. 392, 403–404, 47 S.Ct. 377, 71 L.Ed. 700.

██ Nor do we find error in the inclusion in the conspiracy count as an overt act, and the receiving of evidence of the transaction of July 19, 1955, despite the fact that appellant had already been tried and convicted of that offense in Newark and received a suspended sentence. The crime of conspiracy is a separate and distinct offense. Harvey v. United States, 2 Cir., 23 F.2d 561, 564; United States v. Shapiro, 2 Cir., 103 F.2d 775, 777. There is no double jeopardy; and the evidence was properly received.

Most of the other points require no discussion, we think; but appellant vigorously argues for reversal because the trial judge, over objection, received certain testimony by the West Orange, New Jersey police officers who arrested appellant at his new residence 265 14th Avenue in Newark on January 22, 1956. Armed with a warrant which authorized search of the Campisi residence for a suspect "in a robbery we had in our town" one of the police officers found appellant hiding under a bed. Although the warrant did not mention appellant he was taken into custody but he broke away from the arresting officer and, after some running around the house, dashed through an open window to the roof of the garage and jumped off the roof. But another police officer had been stationed in the rear of the premises and appellant was again taken into custody as he was trying to climb over a fence.

█ It is not seriously disputed that this evidence of attempted escape is admissible as proof of a consciousness of

guilt. The fact that this particular warrant did not call for the arrest of appellant is of course of no consequence. A warrant for the arrest of appellant, issued in the Eastern District on August 2, 1955, was outstanding, and it is of no moment that he was found by accident. What appellant complains of is that it came out that appellant's son Peter was the person the police officers were after, and that he was also arrested. Even more prejudicial, according to appellant's contention, is the receipt, over objection, of proof that in the room where appellant, clothed only in "an underwear top, a pair of slacks and a pair of shoes," was found under the bed, the police officers uncovered a suit of clothes in one of the pockets of which was a small cardboard box containing a syringe, a hypodermic needle, a small silver spoon with a curved handle and a packet of white powder. When questioned by the police officers appellant denied that the suit was his or that he knew anything about the contents of the box.

The reference to Peter was too incidental to be of consequence against the background of the trial record as a whole. Moreover, the prosecutor with commendable fairness earnestly requested the jury "not to take into consideration the fact that Thomas Campisi's son was wanted by the police in New Jersey." The incident is too trivial to warrant reversal.

As to the articles found in the box, it suffices to say that they were not only found in appellant's private home but in the very room where he was hiding under the bed when apprehended. Under the circumstances it was permissible for the jury to infer that these articles were in appellant's possession, in the absence of any proof to the contrary. Cf. People v. Birnbaum, 208 App. Div. 476, 203 N.Y.S. 697. But appellant did not come forward with any such proof; indeed, the defense rested at the close of the prosecution's case, and appellant requested an instruction, which the trial judge gave, to the effect that

no unfavorable inference be drawn from the fact that he did not testify in his own defense. We find no error in any of the rulings made at the trial.

Affirmed.